EDILBERTO R. BELTRAN AND DIADEMA T. BELTRAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Beltran v. Commissioner
Docket No. 18485-80.
United States Tax Court
T.C. Memo 1982-153; 1982 Tax Ct. Memo LEXIS 594; 43 T.C.M. (CCH) 892; T.C.M. (RIA) 82153; March 25, 1982. Gerald H. Lean, for the petitioners. Clare J. Brooks, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: Respondent determined *598 the following deficiencies in the petitioners' Federal income taxes: Taxable Year
Deficiency
1975
$ 5,629.89
1976
5,537.93
1977
3,863.38
The following issues are presented for decision: (1) Whether and to what extent petitioner Edilberto Beltran used his 1975 Mercedes for business purposes; (2) Whether petitioners have adequately substantiated certain deductions for business entertainment expenses and gifts; and (3) Whether certain deductions claimed by the petitioners in connection with the rental of their bayfront house in Ocean Pines, Maryland, are subject to the limitations provided in section 183(b). [1]
FINDINGS OF FACT Some of the facts have been stipulated. The stipulations of facts and the attached exhibits are incorporated herein by reference. Petitioners Edilberto Beltran (hereinafter petitioner) and Diadema Beltran resided in Timonium, Maryland, when they filed their petition herein. They timely filed joint Federal income tax returns for the taxable years in issue with the Internal *599 Revenue Service Center in Philadelphia, Pennsylvania. Petitioner is a physician-anesthesiologist and is an employee, stockholder and director of Beltran, Koh & Wei and Anesthesiology Associates, P.A. (BKW). BKW employed approximately six physicians and three nurse-anesthetists during the years in issue. Petitioner's professional office is located at Franklin Square Hospital (Franklin Square) in Baltimore, Maryland. Petitioner is Chairman of the Anesthesiology Department at the hospital. Petitioner's employment contract with BKW required him to provide and maintain an automobile to be used in the performance of his duties. During the taxable years in issue he owned a 1975 Mercedes which he used for all his business-related driving, including daily commuting between his home and Franklin Square. Approximately twice a week petitioner drove from his office at Franklin Square to the office of BKW's certified public accountant, Mr. Moss Chairs, to deliver bookkeeping data, such as billings, for processing. Mr. Chairs' office was located in Ellicott City, Maryland, approximately 37 miles away from the hospital. Petitioner generally left the hospital in the late afternoon and *600 returned directly to his house in Timonium (approximately eight miles away from Franklin Square) after completing his business in Ellicott City. Petitioner also drove to Ellicott City once a month a attend meetings of the BKW board of directors. At least once a week petitioner drove from Franklin Square to Johns Hopkins University Hospital, a distance of 10 miles, to attend grand rounds (training sessions). He generally drove home after finishing the rounds. During the years in issue petitioner was Secretary of the Maryland-District of Columbia Society of Anesthesiologists. He attended meetings of the Society once a month in either Columbia, Maryland, or at the Baltimore-Washington International Airport. The meetings were held in the late afternoon or at night, so petitioner generally drove from Franklin Square to the meeting and then home afterwards. The distances from Franklin Square to Columbia and the airport were 45 miles and 15 miles, respectively. Petitioner was a member of the board of directors of H.J. Sports Accessories Corp., which went bankrupt near the end of 1975. The corporation was located in Hoboken, New Jersey, 160 miles from Timonium. Petitioner deove *601 from Timonium to Hoboken on several occasions during 1975 and 1976 to attend board meetings or to oversee the winding up of the corporation. Petitioner drove his 1975 Mercedes approximately 12,500 miles each year. His deductible business use averaged 39 percent of this amount, or 4,836 miles each year. Petitioner incurred the following expenses for business entertainment and meals: Year
Payee
Description
Amount
1975
Bamboo House
Business meal
$ 50.45
1975
Bamboo House
Business meal
33.25
1975
Eager House
Business meal
70.00
1975
Chesapeake House
Business meal
128.48
1975
Bamboo House
Employee Christmas
party
92.00
1975
Steak & Rib
Business meal
90.61
$ 464.79
1976
Bamboo House
Business meal
$ 55.60
1976
Nichi Bei Kai
Business meal
54.73
1976
Nichi Bei Kai
Business meal
103.18
1976
Chesapeake House
Journal Club Luncheon
226.93
1976
Steak & Rib
Business meal
72.50
1976
Tom Jones Tavern
Business meal
65.30
$ 578.24
1977
(Miscellaneous
Journal Club Luncheons
$ 160.21
receipts)
The Journal Club luncheon involved a group of anesthesiologists *602 who met periodically to discuss the latest professional journals they had read. The business meals generally involved meetings between the petitioner and his associates, other anesthesiologists or other business acquaintances for the purpose of discussing various aspects of his medical practice. Petitioner incurred the following expenses for business gifts: Year
Donee
Description
Cost
1975
Caroline Nocar
Lighter
$ 8.58
1975
Dr. Sibayan
Book
7.28
1975
Mike Mersow
Attache case
27.96
1975
Dr. Narawol
Books
10.40
1975
(Nursing supervisor)
Clothing
31.20
$ 85.42
1977
Dr. Cua
Steak set
$ 13.75
These gifts were to referral physicians, employees and business associates of petitioner and were related to his trade or business. In 1969 petitioner purchased a small bayfront lot in Ocean Pines, Maryland, for approximately $ 10,000. The property is located about 10 miles north of Ocean City, Maryland, in a development of small shore houses, about a three-hour drive from petitioner's home in Timonium. It is only a short distance away from the beach on the ocean.There are recreational facilities in the area, *603 including a golf course, pools and tennis courts. There is also convenient access to Ocean City. In 1973 petitioner commenced construction of a small four-bedroom prefabricated house on the lot at a cost of $ 28,475. During 1973 and 1974 the house was furnished with various items costing a total of $ 3,425. In 1975 petitioner added a boat dock and patio at a cost of $ 4,960. Petitioner built the house with the intention of renting it out on a year-round basis. The peak rental season in the Ocean Pines area runs from May through the middle of September. In 1975, the first year the house was ready for occupancy, petitioner attempted to attract renters by word-of-mouth advertising and by placing rental notices on bulletin boards in hospitals in the Baltimore area. He rented it for two weeks during the summer of 1975 and received $ 300 in rent. On August 23, 1976, petitioner gave up his informal attempts to advertise the property and entered into a one-year rental listing agreement with Steen's Realty, Inc., to attract more rental business. Under the agreement the realtor was to be paid a 15-percent commission on the gross rents which it generated. The agreement stated that *604 the house was to be rented on a seasonal basis (the May to September peak period) rather than on a year-round basis. Petitioner received $ 600 in rents during 1976. In 1977 petitioner became displeased with the efforts of Steen's Realty and on July 27, 1977 he entered a one-year listing agreement with Vale Management Services, again specifying seasonal rental only. The agreement provided that the property was to be rented according to the following rate schedule: Nightly, $ 35; weekly, $ 250; and for the duration of the season, $ 3,000. In 1977 petitioner received $ 1,100 in rental income. During the years in issue the market for off-season rentals in the Ocean Pines area was weak or nonexistent. On October 16, 1976, petitioner listed the house for sale with Greater Ocean City Multiple Listing Service, Inc., at a price of $ 69,550. He received no offers at that price and was advised by the realtor that he was asking too much. However, he refused to lower his price. At the present time he has no immediate plans to sell the property, although he would consider doing so if he received an offer in the neighborhood of $ 70,000. Petitioner kept no records of the personal use *605 of the Ocean Pines residence. He and members of his family used the property at least three or four weekends a year during the peak season and "no more than two weeks straight" at any time during the year. He always brought along a boat on these visits which he purchased in 1975 and kept at his home in Timonium. On occasion he rented the property to friends for less than a fair market rental. The petitioners reported the following net rental losses on their joint income tax returns for the years in issue: 1975
1976
1977
Rents
$ 300 $ 600 $ 1,100 Depreciation
(2,664)
(2,664)
(2,664)
Other expenses (including
interest and taxes)
()3,954
()3,733
()3,730
($ )6,318
($ )5,797
($ )5,294
In 1978 the petitioners received $ 2,610 in gross rents and reported a net rental loss of $ 4,412. The petitioners reported adjusted gross incomes of $ 74,877, $ 92,419 and $ 119,900 on their Federal income tax returns for 1975, 1976 and 1977, respectively. OPINION Issue 1. Automobile Business Use
The amounts of the expenses which petitioner incurred in connection with the operation of his 1975 Mercedes *606 are not at issue in this case. The only issue we are asked to decide is the percentage of business use for purposes of determining the allowable transportation deduction under section 162(a). On brief petitioner argues that his business use was 74.8 percent during each of the years in issue. Howver, he did not keep a log or other records of his business-related travel and the evidence suggests that a substantial portion of his driving was nondeductible commuting. For example, he testified that he drove to Hoboken, New Jersey, on several occasions to attend to the business of a corporation of which he was a director, but he did not indicate whether the trips originated from or ended at his home as opposed to his business office at Franklin Square Hospital. Unless the trips were overnight, any leg of a journey which began or ended at his home would constitute commuting. See United States v. Correll,389 U.S. 299 (1967); Bilberg v. Commissioner,55 T.C. 611 (1971); Heurer v. Commissioner,32 T.C. 947 (1959), affd. per curiam 283 F.2d 865 (5th Cir. 1960). Similarly, we are unable to determine from this record the extent *607 to which other routine business trips, such as the weekly visits to Johns Hopkins University Hospital and monthly trips to attend meetings of the Maryland-District of Columbia Society of Anesthesiologists, involved commuting to or from petitioner's home. On the basis of petitioner's testimony, however, we are convinced that a certain amount of his driving was indeed legitimate business transportation.Applying the rule of Cohan v. Commissioner,39 F.2d 540, 544 (2d Cir. 1930), and taking into account the stipulated distances between the various business locations and Franklin Square Hospital as well as petitioner's estimate of the total mileage driven in the Mercedes each year, we hold that petitioner is entitled to deduct 39 percent of his automobile expenses as transportation expenses incurred in connection with his medical practice for the 1975, 1976 and 1977 taxable years. Issue 2. Business Entertainment and Gift Deductions
Business entertainment expenses otherwise allowable under section 162(a) must also satisfy the business purpose and substantiation requirements *608 of section 274[2] in order to be deductible. Petitioner produced a number of receipts to support deductions claimed for business entertainment expenses. A listing of the amounts which we think satisfy the conditions for deductibility imposed by sections 162(a) and 274 appears in our Findings of Fact. Most of the receipts contained notations describing the persons involved in the activity. Petitioner admitted that some of the notations were not made "at or near the time of the expenditure" as required by section 1.274-5(c)(2)(ii)(a), Income Tax Regs., but instead were made when he prepared his income tax return for the particular year involved. However, we think these receipts, together with petitioner's testimony as to the purpose of the activities, constitute sufficient other evidence to satisfy the substantiation requirements of section 274(d). See section 1.274-5(c)(3), Income Tax Regs.
*609 The deductions we have allowed qualify for the most part as business meals under section 274(e)(1), and are therefore exempt from the limitations on deductibility contained in section 274(a). We have also allowed a deduction for expenses associated with a Christmas party given for the nurses employed by petitioner's professional corporation. See section 274(e)(5) and section 1.274-2(f)(2)(v), Income Tax Regs. However, we have disallowed certain expenses for which petitioner was unable to give a satisfactory explanation of the business purpose associated therewith. In addition, we have disallowed deductions for the cost of certain parties which he gave in 1977 for residents, interns and nurses employed by Franklin Square Hospital. Petitioner testified that as the Chairman of the Anesthesiology Department of the hospital it was good public relations for him to sponsor such parties for persons who worked with him in the department. In our judgment, however, this does not bring these entertainment activities within any of the exceptions provided in section 274. They were not directly related to the active conduct of petitioner's trade or business and *610 did not follow or precede any substantial and bona fide business discussions. Thus, the exceptions provided in section 274(a)(1)(A) are not applicable. See St. Petersburg Bank & Trust Company v. United States,362 F. Supp. 674 (M.D. Fla. 1973). We also think that the exception provided in section 274(e)(1) (dealing with business meals) does not apply because the food and beverages were furnished under circumstances which were not conducive to business discussions. See section 1.274-2(f)(2)(i)(b), Income Tax Regs. Finally, the exception provided in section 274(e)(5) (dealing with recreational expenses for employees) is not applicable because the persons attending the parties were not employees of petitioner. Based on the foregoing, we hold that petitioner is entitled to deduct entertainment expenses of $ 464.79, $ 578.24 and $ 160.21 for the 1975, 1976 and 1977 taxable years, respectively. Business gifts which are otherwise deductible under section 162(a) are also subject to the ceiling limitations of section 274(b) and the substantiation requirements of section 274(d). In our Findings of Fact we have listed those gifts which we determined to be both *611 adequately substantiated and sufficiently related to petitioner's trade or business to warrant their deductibility. These gifts totaled $ 85.42 and $ 13.75 for the 1975 and 1977 taxable years, respectively. However, two of the gifts in 1975 exceed the $ 25 per donee limitation imposed by section 274(b)(1). Accordingly, the total allowable deduction for business gifts for that year is reduced to $ 76.26.
Issue 3. Deductibility of Rental Expenses
The petitioners claimed rental losses of $ 6,318, $ 5,797 and $ 5,294 for the 1975, 1976 and 1977 taxable years, respectively. Respondent disallowed all deductions other than interest and taxes on the ground that petitioners were not operating the property with a profit objective. [3] We sustain his determination. At the outset, we wish to point out that section 280A, which applies to taxable years beginning after December 31, 1975, has not been raised in this case.One of the purposes of section 280A was to eliminate the need for an inquiry into the taxpayer's motives for holding property by establishing certain mechanical tests which restrict the deductibility *612 of rental expenses depending on the degree of the taxpayer's personal use of the property. Thus, if the petitioners' personal use of the Ocean Pines property exceeded the greater of 14 days or 10 percent of the total rental days during a particular taxable year, the deductions attributable to the property would be subject to the limitations provided in sections 280A(e) and 280A(c)(5). See section 280A(d) (1). There are strong indications in this record that the petitioners' personal use exceeded these parameters during 1976 and 1977. However, since respondent has chosen to disregard this line of attack, we will do likewise and limit our focus to the question of whether the rental of the property constituted an activity not engaged in for profit under section 183. [4]
*613 Section 183(c) defines an activity not engaged in for profit as an activity with respect to which deductions are not allowable under either section 162 (ordinary and necessary expenses incurred in carrying on a trade or business) or section 212 (expenses incurred in the production of income or the management, conservation or maintenance of property held for the production of income). A key requirement under both of these sections is that the taxpayer must have engaged in the activity with the predominant purpose and intention of making a profit. Carkhuff v. Commissioner,425 F.2d 1400 (6th Cir. 1970), affg. a Memorandum Opinion of this Court; Allen v. Commissioner,72 T.C. 28, 33 (1979); Jasionowski v. Commissioner,66 T.C. 312, 319 (1976). The taxpayer's profit objective must be bona fide, although it need not be reasonable, and greater weight is to be accorded the objective facts rather than to the taxpayer's stated intent. Section 1.183-2(a), Income Tax Regs. To aid in the analysis, the regulations under *614 section 183 provide a list of factors to be considered, none of which is determinative. Based on our analysis of these factors, we think petitioner has failed to prove that he had the requisite profit objective during the years in issue. To begin with, the evidence indicates that he did not operate the property in a businesslike manner. See section 1.183-2(b) (1), Income Tax Regs. In 1975, the first year the property was available for rent, his sole means of advertising the property was by word-of-mouth and by placing notices on bulletin boards in some of the Baltimore-area hospitals. This informal technique generated a grand total of $ 300 in rents for 1975. Despite these meager results, petitioner waited until August 23, 1976, when the peak rental season (from May to mid-September) was almost over, to change his tack and list the property for rent with a professional realtor. As a result, he received $ 600 in rents for 1976, only a slight improvement over the prior year. In 1977 he changed realtors in an attempt to stimulate more business but still managed to take in only $ 1,100 in rents during that year. Based on the weekly rental rate specified *615 in the 1977 listing agreement, this translates into only eight weeks of rental occupancy during the entire three-year period the property was held out for rent. The rental losses claimed by petitioner during this same period amounted to a total of $ 17,409. If he was alarmed by this dismal showing, the record certainly does not indicate it. To the contrary, petitioner demonstrated at trial a surprising lack of knowledge about or interest in the operating results of the property. He testified that he kept no books or records of the personal or business use of the property, and had no recollection of whether the rentals were attributable to his advertising efforts or those of the realtors. He also testified that he did not take the recurring rental losses into consideration in determining whether or not he would make a profit if and when he ultimately sold the property. It is true that in 1978 petitioner's gross rents more than doubled the amounts received in 1977. However, even with that increase the property still yielded a net loss of $ 4,412. Indeed, given the sharply defined rental season and the rates petitioner was charging in 1977, it is doubtful whether rental income *616 would have exceeded rental expenses at any time in the foreseeable future. Another fact which undercuts petitioner's assertion of a profit motive is that the listing agreements provided that the property was to be rented only during the peak rental season. Petitioner testified that he built the residence with an eye to renting it on a year-round basis, but subsequently discovered that there was little demand for the property during the off-season and therefore decided to list the property for seasonal rent only. We find it difficult to reconcile this decision with his testimony that he would have gladly rented the property year-round had the business been available, especially since the realtors were paid on commission and would not have charged any additional amount to list the property on a year-round basis. Furthermore, we think petitioner's failure so undertake a careful investigation of the rental market in the Ocean Pines area before investing over $ 36,000 in improving the property is inconsistent with the conduct one would normally expect of an investor who intends to make his profit by holding the property out for rent. Another important factor bearing on the taxpayer's *617 intent is the degree of personal use or enjoyment derived from the activity. See section 1.183-2(b)(9), Income Tax Regs. Exactly how much personal use took place in this case is a matter of dispute. On brief petitioner argues that he and his family used the property no more than 14 days each year, including about three or four weekends during the peak rental season. However, he did not keep any records of his personal use, and his testimony on this point was vague and evasive. When asked to give an estimate of the number of days of personal use, he repeatedly answered "no more than two weeks straight" at any time during a particular year. This ambiguous description does not reassure us that the personal use was minimal or insignificant. It may be that petitioner was under a misunderstanding as to the nature of the 14-day test incorporated in section 280A(d) (1) and tailored his testimony in a manner which he thought would place him beyond the reach of that provision. In any event, he chose his words carefully and he must now live with their consequences. There are other facts which, when viewed against the backdrop of petitioner's cryptic testimony *618 and his failure to keep records, lead us to believe that personal use was substantial, and may well have exceeded business use of the property during each of the years before us. It bears emphasizing that the Ocean Pines residence was available virtually anytime the petitioners wanted to use it because it was rented out for only a very short period each year. Moreover, it was located only about three hours driving distance from their home in Timonium, by no means an unreasonably long weekend commute.It is also of some significance, we think, that whenever they visited the residence they brought along a boat which they had purchased in 1975--the same year the boat dock was added to the property--and which they kept in Timonium when not in use. In addition, the fact that the property was occasionally rented to friends at less than a fair market rental must, to some extent, also be considered a form of personal use. Cf. section 280A(d) (2) (C). On brief petitioner attempts to rebut the numerous adverse inferences which can be drawn from this record by claiming that the prospect of long-term appreciation in the value of the property figured prominently in his decision to improve *619 the property and his willingness to tolerate the rental losses. We recognize that this is an important and acceptable factor to consider in analyzing the profit-motive issue. See sections 1.183-2(b) (4) and 1.212-1(b), Income Tax Regs. On the other hand, the mere fact that the taxpayer is aware of the potential for long-term appreciation does not automatically mean that rental expenses will qualify for deductibility under sections 162 or 212. See Jasionowski v. Commissioner,66 T.C. 312, 323 (1976). There is no evidence that petitioner investigated the prospects for long-term appreciation before buying the lot or building the residence. He did not consult any realtors or professional appraisers in the Ocean Pines area for information concerning the degree to which property values had escalated in past years or for projections of future trends. There is also no evidence that petitioner had ever before purchased real estate for investment purposes. In fact, at no time did petitioner ever directly testify that his purpose for investing in the Ocean Pines residence was long-term appreciation. He stated only that he was persuaded to build a shore house which would *620 "be rented as a business venture" after hearing a big advertising campaign in Ocean City claiming that the surrounding area offered excellent opportunities for business. We think that the facts of this case are clearly distinguishable from those of McKinney v. Commissioner,T.C. Memo. 1981-181, and Copeland v. Commissioner,T.C. Memo. 1980-476, on which petitioner relies so heavily. Among other things, the taxpayers in those cases were able to offer convincing evidence that their investment activities were significantly influenced by anticipated appreciation in property values. Petitioner maintains, nevertheless, that his objective of realizing a profit through eventual sale of the property is evidenced by the fact that he listed it for sale with a multiple listing service on October 16, 1976, for $ 69,550. However, this figure represented approximately 50 percent more than his investment in the property, including the cost of furnishings, and he never received any offers from prospective purchasers. When advised by a realtor that he was asking too much, he refused to lower his price. At the present time he is not actively looking to sell *621 the property, but he did mention at trial that he would be willing to consider an offer in the neighborhood of $ 70,000--approximately the same price he was asking over five years earlier. Under these circumstances we cannot help but question whether petitioner seriously intended to sell the property during the years in issue, or whether he simply listed the property for sale at an inflated price in order to protect his tax losses and perhaps snag an unwary purchaser. Had petitioner proved to our satisfaction that he built the house with the predominant objective of realizing a profit through appreciation in the underlying value of the property, and that his personal use was minimal or non-existent, the size and regularity of the yearly rental losses would pose a far less significant obstacle to their deductibility. However, on this record we are persuaded that he did not possess a legally sufficient profit objective and therefore the rental expenses are deductible only as provided in section 183(b). Since the deductions already allowed by respondent for interest and taxes exceeded rent income during each year of the taxable years, petitioners are not entitled to any additional *622 deductions. See section 183(b) (2). To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the years in issue, unless otherwise indicated.↩
2. The portions of section 274 which are relevant to this case are as follows: SEC. 274. DISALLOWANCE OF CERTAIN ENTERTAINMENT, ETC., EXPENSES. (a) ENTERTAINMENT, AMUSEMENT, OR RECREATION.-- (1) IN GENERAL.--No deduction otherwise allowable under this chapter shall be allowed for any item-- (A) ACTIVITY.--With respect to an activity which is of a type generally considered to constitute entertainment, amusement, or recreation, unless the taxpayer establishes that the item was directly related to, or, in the case of an item directly preceding or following a substantial and bona fide business discussion (including business meetings at a convention or otherwise), that such item was associated with, the active conduct of the taxpayer's trade or business, * * * and such deduction shall in no event exceed the portion of such item directly related to, or, in the case of an item described in subparagraph (A) directly preceding or following a substantial and bona fide business discussion (including business meetings at a convention or otherwise), the portion of such item associated with, the active conduct of the taxpayer's trade or business. (b) GIFTS.-- (1) LIMITATION.--No deduction shall be allowed under section 162 or section 212 for any expense for gifts made directly or indirectly to any individual to the extent that such expense, when added to prior expenses of the taxpayer for gifts made to such individual duridng the same taxable year, exceeds $ 25. * * * (d) SUBSTANTIATION REQUIRED. No deduction shall be allowed-- (1) under section 162 or 212 for any traveling expense (including meals and lodging while away from home), (2) for any item with respect to an activity which is of a type generally considered to constitute entertainment, amusement, or recreation, or with respect to a facility used in connection with such an activity, or (3) for any expense for gifts, unless the taxpayer substantiates by adequate records or by sufficient evidence corroborating his own statement (A) the amount of such expense or other item, (B) the time and place of the travel, entertainment, amusement, recreation, or use of the facility, or the date and description of the gift, (C) the business purpose of the expense or other item, and (D) the business relationship to the taxpayer of persons entertained, using the facility, or receiving the gift. * * * (e) SPECIFIC EXCEPTIONS TO APPLICATION OF SUBSECTION (a).-- Subsection (a) shall not apply to-- (1) BUSINESS MEALS.--Expenses for food and beverages furnished to any individual under circumstances which (taking into account the surroundings in which furnished, the taxpayer's trade, business, or income-producing activity and the relationship to such trade, business, or activity of the persons to whom the food and beverages are furnished) are of a type generally considered to be conducive to a business discussion. (5) RECREATIONAL, ETC., EXPENSES FOR EMPLOYEES.-- Expenses for recreational, social, or similar activities (including facilities therefor) primarily for the benefit of employees (other than employees who are officers, shareholders or other owners, or highly compensated employees). For purposes of this paragraph, an individual owning less than a 10-percent interest in the taxpayer's trade or business shall not be considered a shareholder or other owner, and for such purposes an individual shall be treated as owning any interest owned by a member of his family (within the meaning of section 267(c)(4)↩).
3. The amounts of the deductions claimed are not in dispute.↩
4. The pertinent portions of section 183 are as follows: SEC. 183. ACTIVITIES NOT ENGAGED IN FOR PROFIT. (a) GENERAL RULE.--In the case of an activity engaged in by an individual or an electing small business corporation (as defined in section 1371(b)), if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section. (b) DEDUCTIONS ALLOWABLE.--In the case of an activity not engaged in for profit to which subsection (a) applies, there shall be allowed-- (1) the deductions which would be allowable under this chapter for the taxable year without regard to whether or not such activity is engaged in for profit, and (2) a deduction equal to the amount of the deductions which would be allowable under this chapter for the taxable year only if such activity were engaged in for profit, but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1). (c) ACTIVITY NOT ENGAGED IN FOR PROFIT DEFINED.--For purposes of this section, the term "activity not engaged in for profit" means any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212↩.